1
2
3
4
5
6
7
8
9          IN THE UNITED STATES DISTRICT COURT FOR THE

10                   EASTERN DISTRICT OF CALIFORNIA

11

COUNTY OF INYO,                          )      CV F 06-1502 AWI DLB
12                                       )
                  Plaintiff,             )      ORDER ON MOTIONS BY
13                                       )      DEFENDANTS AND
       v.                                )      DEFENDANT-INTERVENORS
14                                       )      TO DISMISS FOR LACK OF
DEPARTMENT OF THE INTERIOR,              )      SUBJECT MATTER
15  DIRK KEMPTHORNE, in his capacity     )      JURISDICTION
    as Secretary, NATIONAL PARK          )
16  SERVICE, MARY A. BOMAR, in her       )      F.R.C.P. 12(b)(1)
    capacity as Director, and JAMES T.   )
17  REYNOLDS, in his capacity as         )
    Superintendent, Death Valley National )     Doc.  #'s  46 and 49
18  Park,                                )
                                         )
19                  Defendants, and      )
                                         )
20  SIERRA CLUB, *et al.*                )
                                         )
21          Defendant-Intervenors        )
                                         )
22  _____ )

23

24          This is an action by plaintiff County of Inyo ("Plaintiff") to quiet title to rights of way that

25  lie inside federal land in the vicinity of Death Valley National Park, near the California-Nevada

26  border.  Defendants are the Department of the Interior, Dirk Kempthorne, Director; National Park

27  Service, and Mary A. Bomar, Director; and James T. Reynolds, in his capacity as Superintendent

28  of Death Valley National Park (collectively, "Federal Defendants").  Defendant- intervenors are a

group of environmental interest organizations including Sierra Club, The Wilderness Society, California Wilderness Coalition, National Parks Conservation Association, Center for Biological Diversity, and Friends of the Inyo (collectively "Intervenors").  For purposes of this motion, Federal Defendants and Intervenors will be referred to as "Defendants."

In the instant motion Defendants seek to dismiss the complaint in its entirety for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. Defendants move to dismiss on the ground Plaintiff's action is barred by the applicable statute of limitations or, in the alternative, Plaintiff has failed to plead the necessary element of presentation of the claim within the statutory period.  For the reasons that follow, Defendants' motion to dismiss will be granted in part and denied in part.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This action concerns four rights of way that are situated near Death Valley National Monument, near the California-Nevada border.  Two of these rights of way, Petro Road and Lost Section Road, are located in a roughly triangular area bounded by highway 190 on the north, highway 127 on the east, and by the National Monument boundary on the west and south.  Padre Point Road is located in an area adjacent to the western boundary of the national monument and north of highway 190.  The fourth right of way, Last Chance Road is located near the northern boundary of the National Monument near the California-Nevada border.  Petro Road, Lost Section Road and Last Chance Road were established during the early part of the 1900's as roads connecting small, now mostly depopulated mining communities and mining areas with more established roads and railroads.  Padre Point Road was established in the 1950's as a short, scenic side-road off of highway 190.  Plaintiff alleges all four roads are basically graded dirt roads that have been maintained as needed by Plaintiff and that have been used in recent times for sightseeing, law enforcement, and regional management.

In 1976, the Federal Land Policy and Management Act ("FLPMA") was enacted.  Among other things, the FLPMA placed desert lands in California, including the lands underlying the rights of way at issue in this action, into the California Desert Conservation Area ("CDCA") for

the purpose protecting their wilderness characteristics.  43 U.S.C. § 1781.  The FLPMA also required that BLM identify and evaluate roadless areas of five thousand acres or more in size for their wilderness values.  Pursuant to section 1782, surveys of the roadless areas were to be completed and recommendations made to the President by July 1, 1980,  for designation of those lands that are appropriate for inclusion in wilderness areas.  The process of evaluation and recommendation was divided into three phases; an inventory phase, a study phase and the reporting phase.  The inventory phase was further subdivided into an initial inventory, and a subsequent "intensive inventory.  California State Lands Comm'n, 58 IBLA 213, 214 (1981).

Exhibit 1 to intervenors' motion to dismiss sets forth portions of BLM's Wilderness Inventory Handbook, (hereinafter, the "Handbook") published September 27, 1978.  Doc. 3 49-1. The Handbook describes in some detail the inventory phase.  Pursuant to the Handbook, the initial inventory is intended to separate the areas "that (1) clearly and obviously do not meet the criteria for identification as Wilderness Study Areas, or (2) may possibly meet the criteria and will require more intensive inventory."  Handbook at 10.  The purpose of the intensive inventory is to "obtain the information necessary to make a determination for each inventory unit included in the intensive inventory as to whether all (or part of [the land units preliminarily identified]) have or don't have the roadless and wilderness characteristic criteria required for Wilderness Study Area [hereinafter "WSA"]identification."  Handbook at 11.

For those inventory units that are identified by the inventory process as WSA's, the FLPMA provides that BLM shall manage WSA's "so as not to impair the suitability of such areas for preservation as wilderness, . . . ."  43 U.S.C. 1728 (c).  Pursuant to the Handbook, any study unit that is determined either initially or after intensive study to not be qualified for designation as a WSA is released from the restrictive use management of FLPMA following a 30-day comment period.  The inventory period concluded on March 31, 1979, with the publication of the State BLM Director's final determination of Wilderness Study Areas, including narrative descriptions of each area and maps of the designated areas.  See Exhibit 3 of Intervenors' motion to dismiss, Doc. # 49-3.

3

1    Exhibit 3 to Intervenors' motion to dismiss includes relevant portions of the descriptive

2    narratives from the Final Report for the WSA's that incorporate the four alleged rights of way at

3    issue in this action.  The descriptive narrative for WSA # 112, which incorporates Last Chance

4    Road, describes the area as being bounded on the south by a road that is also called Last Chance

5    Canyon Road from which the subject Last Chance Canyon Road branches northward and

6    continues until its intersection with Cucomongo Canyon Road on the north boundary of the

7    WSA.  Doc. # 49-3.  A road that parallels the subject Last Chance Canyon Road north from the

8    southern boundary to Last Chance Spring was "cherry stemmed" out of the WSA, as was a short

9    three-quarter mile segment of the subject Last Chance Canyon Road at the northern end where it

10   intersects with Cucomongo Canyon Road.

11   With respect to WSA # 147, the area that contains Petro Road, BLM's Final Descriptive

12   Narrative of the Wilderness Inventory describes the WSA as being adjusted to *exclude*:

13       areas where man's impact has degraded the natural character.  The exclusion
         includes active, abandoned mining operations, patented mining at Section 21, 29,
14       31 - 33 (T. 25 N., R 4 E.), a graded road, and a network of unimproved says.  The
         graded road leads east from Death Valley Junction past the remains of the
15       abandoned Lila C Mine (site of Old Ryan - now only tunnels, slag piles, and
         rusting equipment remain) to an area laced with old roads and mining claims at
16       the mouth of Greenwater Canyon.  A grid-like network of unimproved ways is
         located in the vicinity of the Lila C Mine.  At the site of the New Ryan, on the tip
17       of the Greenwater Range, active and abandoned mining operations occur side-by-
         side.  Tunnels, slag piles, and road scars exist here as well as many of the old
18       structures there were once inhabited by the population of Ryan.

19   Doc. # 49-3.

20   Although comparisons between the various maps submitted is somewhat difficult owing

21   to differences in scale, orientation and clarity, it appears to the court that description of the

22   "unnamed road" in the narrative report corresponds roughly to the route taken by Petro road.  The

23   term "roughly" is use here to denote what appears to be an inaccuracy in the narrative

24   description.  According to the maps provided as exhibit 1 to Plaintiff's complaint, Lila C Mine

25   lies south-west of Death Valley Junction, not east.  Making that correction, it appears to the court

26   that Petro Road, which travels west by south from its junction with state route 127 a few miles

27   south of Death Valley Junction to the vicinity of the Lila C Mine, is the only road or right of way

28                                              4

visible on the topographical map that accesses the area of the Lila C Mine from the vicinity of Death Valley Junction.  The final BLM map of the California Desert Wilderness Inventory, exhibit 5 to Intervenors' motion to dismiss, is not inconsistent with this conclusion.  The map of WSA # 147 shows an area not designated as WSA that appears to include a drawn-in road from the vicinity of Death Valley Junction to the general area of the Lila C Mine.  The area not included in WSA 147 also appears to include the portion of Petro Road that proceeds first west by north from the area of the Lila C Mine, and then due west, until the road turns south into Greenwater Canyon.

The purpose of the study phase, which followed the State BLM Director's final determination of Wilderness Study Areas, was to make the final determination of suitability for wilderness designation as to each of the WSA's.  Federal Defendants provide a brief sketch of the study phase of the FLPMA process at footnotes # 5 and # 12 of their reply to Plaintiff's opposition to the motion to dismiss.  According to Federal Defendants, the study period spanned roughly the period from 1980 to 1990.  The California Desert Conservation Area plan, which contained the preliminary recommendations for wilderness suitability for WSA's, was published in September 1980.  The California State BLM Director made his recommendations to the National BLM Director in December, 1984.  "BLM's final suitability recommendations were included in BLM's Statewide Wilderness Study Report which was completed in 1990."  Doc.# 58 at fn.12.

Although Plaintiff appears to characterize the FLPMA process as being interrupted or derailed at the reporting phase, Federal Defendants allege that the process was completed in that BLM's recommendations for areas to be designated as wilderness areas were, in fact, forwarded to the President in June of 1991 and the president's recommendations were forwarded to Congress on July 26, 1991.  Federal Defendants do, however, point out that "Congress designated wilderness areas beyond the areas recommended as suitable for wilderness by BLM. . . ."  Doc. # 58 at fn.5.  Thus, to the extent there was any discontinuity with respect to the FLPMA process, it appears to have been in the legislative process that resulted in wilderness designations

of lands that were not recommended as suitable for wilderness designation by BLM.

The Wilderness Study Report recommended that none of the area in WSA # 112 be designated as wilderness area. Doc. # 49-8. Similarly, the <u>Wilderness Study Report</u> recommended that none of the area in WSA # 147 be designated as wilderness area. Doc. # 49-8. WSA's numbered 127 and 148, incorporating Padre Point Road and Lost Section Road South, respectively, were described in the narrative descriptions as having little or no indications of presence of human activities. The major portions of both WSA's were recommended for wilderness designations in the <u>Wilderness Study Report</u>.

In 1994 the California Desert Protection Act, PL 103-433, October 31, 1994, 108 Stat. 4471 ("CDPA"), placed the areas described by BLM's final report, including the lands underlying the rights of way in question, under the jurisdiction of the National Park Service as protected wilderness lands. Plaintiff alleges, and exhibit material made available by Plaintiff appears to confirm that the 1994 CDPA was not strictly the product of the process set forth in the FLPMA, but rather was the product of a combination of the FLPMA process and a protracted parallel effort between 1980 and 1994, primarily by Senator Alan Cranston, D. California, to upgrade the protected status of lands suitable for wilderness designation in the Mojave Desert. As a consequence of perceptions that the administrations of Presidents Reagan and Bush were not sympathetic to efforts to afford greater wilderness protection to lands in the Mojave Desert, the focus of efforts to designate desert lands as wilderness areas centered on the legislature, culminating in the passage of the CDPA in 1994. The legislative effort apparently included a good deal of political wrangling and the results were not exactly consistent with BLM's recommendations as to what tracts of land, or portions thereof, should be set aside as wilderness areas. <u>See</u> E.C. Nystrom, <u>From Neglected Space to Protected Place: An Administrative History of Mojave National Preserve</u> (National Park Service, Mar. 2003), Doc.# 8-10.

Plaintiff alleges that it was prevented from accessing or performing maintenance on any of the four rights of way following enactment of the CDPA in 1994, but not before that time. The four rights of way have been closed to vehicular traffic since 1994, either by the positing of

6

signs or by the erection of physical barriers.

Plaintiffs filed their complaint under the Federal Quiet Title Act, 28 U.S.C. § 2409a, on October 25, 2006. The court granted Intervenors' motion to intervene on June 14, 2007. The Federal Defendants and Intervenors filed separate motions to dismiss on May 9, 2008. Plaintiff filed its opposition on May 22, 2008. Intervenors and Federal Defendants filed separate replies on June 13, 2008. On June 17, 2008, the court vacated the scheduled hearing date of June 23, 2008, and took the matter under submission.

**LEGAL STANDARD**

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a motion to dismiss for lack of subject matter jurisdiction. It is a fundamental precept that federal courts are courts of limited jurisdiction. Limits upon federal jurisdiction must not be disregarded or evaded. Owen Equipment & Erection Co. v. Kroger, 437 U.S. 365, 374 (1978). The plaintiff has the burden to establish that subject matter jurisdiction is proper. Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994). This burden, at the pleading stage, must be met by pleading sufficient allegations to show a proper basis for the court to assert subject matter jurisdiction over the action. McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Fed. R. Civ. P. 8(a)(1). When a defendant challenges jurisdiction "facially," all material allegations in the complaint are assumed true, and the question for the court is whether the lack of federal jurisdiction appears from the face of the pleading itself. Thornhill Publishing Co. v. General Telephone Electronics, 594 F.2d 730, 733 (9th Cir. 1979); Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F. 2d 884, 891 (3d Cir.1977); Cervantez v. Sullivan, 719 F. Supp. 899, 903 (E.D. Cal.1989), rev'd on other grounds, 963 F. 2d 229 (9th Cir.1992).

A defendant may also attack the existence of subject matter jurisdiction apart from the pleadings. Mortensen, 549 F. 2d at 891. In such a case, the court may rely on evidence extrinsic to the pleadings and resolve factual disputes relating to jurisdiction. St. Clair v. City of Chico, 880 F. 2d 199, 201 (9th Cir.1989); Roberts v. Corrothers, 812 F.2d 1173, 1177 (9th Cir.1987); Augustine v. United States, 704 F.2d 1074, 1077 (9th Cir.1983). "No presumptive truthfulness

attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." <u>Thornhill Publishing</u>, 594 F.2d at 733 (quoting <u>Mortensen</u>, 549 F.2d at 891).

"In resolving a Rule 12(b)(1) motion [to dismiss] for lack of subject matter jurisdiction, unlike motions brought pursuant to Rule 12(b)(6), courts are generally free to consider relevant materials outside the pleadings. [Citations.]" <u>Nat'l Comty. Reinvestment Coalition v. Nat'l Credit Union Admin.</u>, 290 F.Supp.2d 124, 131 (D.C. 2003).

## DISCUSSION

This action involves three legal regimes; the regime that created the rights of way in question, the regime that establishes the limitations of human intrusion into wilderness areas, and the regime that makes it possible for a state governmental entity to sue the United States to quiet title to real property in which United States claims an interest. For purposes of the present motion the first two of these regimes require only very brief explanation.

The four rights of way at issue in this action were established under a nineteenth century enactment of congress that permitted local entities to establish legal rights in the roads that traversed public lands simply by establishing them. As the court explained in its order on the motion for intervention:

> "In 1866, Congress enacted an offer of grants of rights of way over unreserved public lands for the construction of highways." Pamela Baldwin, <u>Highway Rights of Way: The Controversy Over Claims Under R.S. 2477</u> CRS Report for Congress (1993), Exhibit 1 to Doc. # 24. The grant was originally at section 8 of the Mining Act of 1866, which became section 2477 of the Revised Statutes, which was codified at 43 U.S.C., section 932, until it was repealed in 1976. Rights of way granted pursuant to this section continue to be referred to as R.S. 2477 grants. The repeal in 1976 of authority to grant rights of way under this provision recognized the validity of rights of way that were established as of the date of repeal. <u>Id.</u>

Doc. # 32 at 2:6-13. The parties agree that, in California, the grant of rights of way pursuant to R.S. 2477 was self executing, meaning that the rights were established upon establishment of the road itself without the need of any further action on the part of the governmental entity. R.S. 2477 was repealed in 1976 by the enactment of the FLPMA, which preserved rights established

under R.S. 2477 that existed as of the date of enactment.  For purposes of this motion, it may be assumed that Plaintiff established rights of way pursuant to R.S. 2477 as to the four rights of way at issue in this action and that those rights of way were preserved by the FLPMA.

The stated overall purpose of the Wilderness Act is to preserve "area[s] where the earth and its community of life are untrammeled by man," 16 U.S.C. § 1131(c).  Pertinent to the instant motion, the Wilderness Act limits certain activities in wilderness areas as follows:

> Except as specifically provided for in this chapter, and subject to existing private rights, there shall be no commercial enterprise and <u>no permanent road within any wilderness area</u> designated by this chapter and, except as necessary to meet minimum requirements for the administration of the area for the purpose of this chapter (including measures required in emergencies involving the health and safety of persons within the area), there shall be <u>no temporary road, no use of motor vehicles, motorized equipment</u> or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area.

16 U.S.C. § 1133(c) (emphasis added).

"Originally, the doctrine of sovereign immunity barred quiet title actions against the United States. [Citations.]" <u>Knapp v. United States</u>, 636 U.S. F.2d 279, 281 (10th Cir. 1980). "Enacted in 1972, the Quiet Title Act, 28 U.S.C. § 2409(a) waives immunity to such suits," however, "[t]imleliness under subsection (f) is a jurisdictional prerequisite to suit under section 2409(a)." <u>Id.</u>  The timeliness requirement for court jurisdiction under the Quiet Title Act is set forth in subsection (g) as follows:

> Any civil action under this section, except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued.  Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew of should have known of the claim of the United states.

28 U.S.C. § 2409a(g).

This case is an action to quiet title to the four rights of way at issue in this case. Defendants' instant motion to dismiss requires the court to consider only two very narrow questions; did Plaintiff file the action to quiet title within the statutory time limit and, if so, did Plaintiff adequately plead the requisite elements?

**I. Timeliness of Action**

"The test for accrual under section 2409a(f)[1] is when 'the plaintiff or its predecessor in interest knew or should have known of the claim of the United States.' 28 U.S.C. § 2409a(f). Knowledge of the claim's full contours is not required.  All that is necessary is a reasonable awareness that the government claims some interest adverse to the plaintiff's." Knapp, 636 F.2d at 283.  The words "'should have known' in section 2409a(f) impart a test of reasonableness," such that constructive notice of a claim of the United States may be sufficient to commence the running of the statute of limitations.  Cal. ex rel. State Land Comm'n v. Yuba Goldfields, Inc., 752 F.2d 393, 396 (9th Cir. 1984) ("Yuba Goldfields").

Knowledge of a claim of the United States for purposes of triggering the statute of limitations implicates two component questions: what constitutes notice, and what constitutes a "claim of the United States?"  See Vincent Murphy Chevrolet Co. v. United States, 766 F.2d 449, 451 (10th Cir. 1985) ("present case does not involve the question of when it was reasonable for appellants to have known of the claim of the United States, but rather centers upon the question of just what is the 'claim' of the United States for purposes of section 2409a(f)").

In the present case, as in Vincent Murphy Chevrolet, there is no real question as to notice. The evidence submitted by Defendant and Intervenors clearly demonstrates Inyo County, through various of its officials and agencies, was throughly involved in the FLPMA study process, at least through the completion of the survey phase that yielded BLM's report on Wilderness Study Areas in California that was released in December 1984, and was the topic of intense review and appeal to the Interior Board of Land Appeals ("IBLA") in 1985.  See Memo of Inyo County Board of Supervisors re: Appeal of State BLM Director's Recommendation to the National BLM Director, Exhibit # 106 to Declaration of Bruce D. Bernard, Doc. # 48.  The issue on which this case turns is therefore not whether or when Plaintiff was notified of a claim of the United States, it is whether and when the United States stated a claim against Plaintiff's rights of way sufficient

---

[1]   Subsection 2409a(f) was redesignated subsection 2409a(g) by the 1986 amendments, Pub.L. 99-598.

to commence the running of the statute of limitations.

In Yuba Goldfields, the Ninth Circuit Court of Appeals noted that accrual of a cause of action under the Quiet Title Act does not require a showing of adversity, nor does it require that the United States' claim be communicated in clear, unambiguous language.  752 F.2d at 397.  It is sufficient, the Yuba Goldfields court held, that the government's claim (in that case, a recorded deed in the name of United States as sole grantee) was sufficient to trigger the running of the statute of limitations where the deed "constituted a cloud on California's title."  Id.  The Yuba Goldfields court did note without disapproval, however, that other courts have found the running of the statute of limitations for the Quiet Title Act was not triggered where the claim of the United States is legally ambiguous or vague.  Id.

In Poverty Flats Land & Cattle Co. v. United States, 706 F.2d 1078 (10th Cir. 1983), the appellate court held that the statute of limitations on an action under the Quiet Title Act was not triggered by conveyance of a land patent for grazing rights that reserved mineral rights to the United States where mining activities that were instituted by a lessee of the United States twelve years later were for the purpose of removing a substance called caliche.  A review of the law by the appellate court revealed that it was unsettled whether caliche was in fact a mineral for purposes of the reservation of mineral rights and so it was unsettled whether the United States retained an interest in the mining of caliche that could be leased.  The court held that where the law is unsettled as to the applicability of a legal claim of the United States, the statute of limitations is not triggered.  Id. at 1080.  See also Amoco Prod. Co. v. United States, 619 F.2d 1383, 1388-89 (10th Cir. 1980) (limitations period under Quiet Title Act not triggered where state law is ambiguous with regard to whether constructive notice of adverse claim is evidenced by stray deed in tract index).  In Peterson v. Morton, 465 F.Supp. 986 (D. Nev. 1979), *partly vacated on other grounds*, 666 F.2d 361 (9th Cir. 1982), the district court held a public law authorizing the sale of certain federal lands to the state of Nevada did not trigger the running of the statute of limitations for purposes of the Quiet Title Act where the authorization was "subject to any rights pertaining to the lands within the transfer area."  Id. at 990.

In the instant action, Defendants contend that BLM's final report of March 1979 designating the WSA's constitutes a cloud on Plaintiff's claims to the rights of way at issue in this case.  Defendants contend that, because BLM was tasked with the determination of "roadless" areas" that are 5,000 or more acres in size, BLM's determination that the areas incorporated by WSA's designated numbers 112, 127. 147 and 148 are, by definition,  "roadless" insofar as the Federal Defendants are concerned.  Defendants contend that by pronouncing these areas "roadless," the Federal Defendants asserted a claim that was sufficient to cloud Plaintiff's title to the rights of way at issue.  Plaintiff, on the other hand, contends that its cause of action under the Quiet Title Act did not accrue until BLM took direct action to prohibit either vehicular traffic on the rights of way or notified Plaintiff that further maintenance or use of the rights of way was not permitted.  Plaintiff contends that, at the earliest, notice of a claim of the United States occurred with the enactment of the California Desert Protection Act in 1994.

### A. Petro Road - Eastern Segment

As an initial matter, the court notes that the information before it indicates that the eastern segment of Petro Road; that is, the segment starting from its intersection with state route 127 and continuing until it enters the northern end of Greenwater Canyon, stands in different stead with respect to any possible claim by United States than any of the other rights of way.  So far as the court can determine, the eastern segment of Petro Road was determined by BLM to not be included in WSA # 147 as reflected both in both  BLM's Final Descriptive Narrative of the Wilderness Inventory and the corresponding map.

Wilderness Study Area  # 147 initially incorporated the entirety of Petro Road.  BLM's initial inventory listed as  WSA # 147 as eligible for intensive inventory, but the intensive inventory determined the area contains "an unnamed road" as well as a number of "old roads" and "unimproved ways" as well as other indicia of the presence of man.  The portion of WSA # 147 that was thus described in the narrative description was assigned non-WSA status in BLM's final decision.  To the extent there may be any suggestion by Defendants that the initial designation of the containing Petro Road constituted a declaration the area was roadless, the

evidence before the court does not support that contention.  Both the Handbook's language describing the inventory process and the example of Petro Road clearly indicates that BLM's initial listing of an area as a WSA at the end of the initial inventory does not reflect BLM's determination that the area *is* roadless; only that it *may be* roadless and may potentially possess wilderness values.  The determination that a given area *is* "roadless" can only be held to have been made conclusively as of the completion of BLM's intensive survey.

Defendants' basic contention with regard to the timeliness of Plaintiff's action is that Plaintiff's cause of action accrued in 1979 with the publication of BLM's final list of WSA's in the Federal Register.  Although the court will examine Defendants' contention more closely *infra*, it is sufficient for purposes of the discussion on the status of the eastern segment of Petro Road that the court simply accept  Defendants' contention.  Stated another way, Defendants contend that Plaintiff knew or should have known of a claim by the United States that was adverse to Plaintiff's claim in 1979 when BLM published its final list of WSA's as reflected in the Final Descriptive Narrative of the Wilderness Inventory and the corresponding map.  If the final determination that a particular tract of land was designated as a WSA triggers the running of the statute of limitations, then it must logically follow that BLM's final determination that a particular tract of land is *not* included as a WSA does not state a claim of the United States and therefore does not commence the running of the statute of limitations.

The court concludes that the land incorporating the eastern segment of Petro Road from its junction with state route 127 to its southward turn into Greenwater Canyon was excluded from those lands finally designated as WSA's.  As a consequence, the United States did not state a claim against Plaintiff with respect to that segment of Petro Road at any time within the FLPMA process; that is, from 1978 through the transmittal of BLM's final recommendations to Congress in 1991.  This conclusion is consistent with the policy set forth in the Handbook to release those tracts of land that are taken out of WSA status as a result of the FLPMLA process from the obligation of BLM to manage the land to preserve its wilderness characteristics pursuant to 43 U.S.C. § 1782(c).  Thus, once a tract of land is removed from WSA status, whether or not

the land was initially identified as a WSA, the United States relinquishes any claim that is adverse to existing claims of rights of way and, as a consequence, there is no triggering of the statute of limitations.

So far as the court can discern, there was nothing that occurred between 1991 and the enactment of the California Desert Protection Act on October 31, 1994, that could reasonably be said to give notice of a claim by United State to any of the lands that BLM had previously recommended for non-designation as WSA's. The court therefore concludes that Plaintiff's claim under the Quiet Title Act with respect to the eastern segment of Petro Road accrued no sooner than with the enactment of the California Desert Protection Act on October 31, 1994. Because this action was filed within 12 years of that date, Plaintiff's claim with respect to the eastern segment of Petro Road is not time-barred.

### B. Running of the Statute of Limitations as to Claims in Lands Designated WSA's

The evidence presented in this case indicates that the lands incorporating each of the rights of way at issue in this case, other than the eastern segment of Petro Road, were initially classified as WSA's and retained that classification throughout the FLPMA process. The question as to each of these remaining areas is at what point did the United States assert a claim that was hostile to Plaintiff's claims to the rights of way such that the running of the statute of limitations for the Quiet Title Act was triggered? Plaintiff contends the United States' did not make a claim that was hostile to Plaintiff's interest in the rights of way until the CDPA was enacted in 1994. Defendants, on the other hand contend Plaintiff's cause of action under the Quiet Title Act accrued in 1979 when BLM made its final determination as to the WSA's and published the list of WSA's in the Federal Register.

Taken a face value, the final designation of an area as a WSA reflects BLM's judgment that the area is a "roadless" area of greater than 5,000 acres that contains "wilderness characteristics." 43 U.S.C. § 1782(a). Under the FLPMA, designation of an area as a WSA implicates two commitments. First, there is a commitment to take an in depth look at the area's wilderness qualities to determine if it could be recommended to the President for review and

1  recommendation to congress for designation as wilderness area under the Wilderness Act.  The

2  purpose of the inventory phase that determined which lands qualify as WSA's was to capture for

3  further study all the tracts of land that *may* qualify for recommendation as wilderness areas while

4  including none that are obviously disqualified from recommendation.  This determination, as the

5  history of the WSA's at issue in this action illustrates, is far from a determination that the given

6  area does, in fact, possess sufficient wilderness characteristics to be recommended by BLM for

7  inclusion in a wilderness area, and is further still from actual incorporation by Congress into a

8  wilderness area under the Wilderness Act.

9       Designation of a tract of land as a WSA also implicates a commitment by BLM to

10  manage the land "so as not to impair the suitability of such areas for preservation as wilderness,

11  subject, however, to the continuation of existing mining and grazing uses and mineral leasing in

12  the manner and degree in which the same was being conducted on October 21, 1976."  35 U.S.C.

13  § 1782(c).  Thus, while designation of an area as a WSA does not necessarily impair its use to the

14  extent the use was established prior to the designation, the designation does impair the ability of

15  Plaintiff to carry out any actions that would diminish the area's wilderness values; for example,

16  by paving, resurfacing, widening, redirecting, or otherwise improving an existing right of way.

17       In terms of possible claims of the United States that may reasonably be understood as

18  adverse to Plaintiff's claims, there are three possibilities: (1) the prohibition of improvement or

19  development of a right of way may be an adverse claim, (2) the placement of the area into a

20  category of areas that may eventually be classified as wilderness areas may constitute an adverse

21  claim, or (3) BLM's declaration of an area as "roadless" may constitute an adverse claim.

22        ***1.  BLM's Determination of "Roadlesness" Does Not Trigger A Claim***

23       Defendants assert that BLM's determination that the areas designated as WSA's are

24  "roadless" was the triggering event for the running of the statute of limitations.  Defendants rely

25  on Southwest Four Wheel Drive Ass'n v. Bureau of Land Management, 271 F.Supp.2d 1308 (D.

26  N.M. 2003) for the propositions that publication in the Federal Register of BLM's decision that a

27  particular tract of land is included in a WSA is sufficient to trigger the running of the statute of

28                                          15

limitations.  Two features of <u>Southwest Four Wheel Drive</u> case cast doubt on the persuasive force of that case here.  First, the decision of the district court was upheld on appeal on grounds that were not addressed at all in the district court's opinion.  <u>See</u> <u>Southwest Four Wheel Drive Ass'n v. Bureau of Land Management</u>, 363 F.3d 1069, 1070 (10th Cir. 2004) (holding dismissal of case was appropriate because plaintiff could not make a claim against United States because plaintiff, a private association, cannot have a title in a public road, and leaving unaddressed whether action was barred by statute of limitations).  Second, the district court's opinion in <u>Southwest Four Wheel Drive</u> is completely silent on the issue that this court feels is pivotal in this case; that is, whether BLM's determination of the "roadless" nature of a tract of land is sufficient to constitute a cloud on the plaintiff's title.  The court concludes <u>Southwest Four Wheel Drive</u> is both non-authoritative and not particularly helpful to this court's determination of the starting point for the running of the statute of limitations.

Logic dictates that the ability of BLM's designation of a particular area as a WSA to constitute a cloud on Plaintiff's title to the right of way is derived entirely from the effect of that determination to either prevent current enhancement of the right of way or to potentially prevent future use of the right of way, or a combination of the two.  Were it not for the fact that a plaintiff is either presently or contingently prevented from some use or enhancement of the right of way because of its designation as a WSA, the designation of the area as "Roadless" would not be a cloud on Plaintiff's title, it would simply be a difference of opinion.  The court therefore concludes that BLM's declaration that an area is "Roadless" does not constitute a claim that is sufficient, in and of itself, to commence the running of the statute of limitations.  If BLM's designation of an area as a WSA is sufficient to commence the running of the statute of limitations, it does so either because a present impairment of use of the land that is bounded in time, or the contingent future impairment of use that is not bounded in time, is sufficient to cloud Plaintiff's claim of title.

### *2.  Quiet Title Claim Does Not Accrue Where Impairment of Use is Only Contingent*

1    While it is well established that the contours of the United States' claim need not be

2  definitely established, the cases reviewed by this court indicate there must be some sense in

3  which the claims of the United States are present and tangible, as opposed to distant and/or

4  contingent.  In Vincent Murphy Chevrolet, the court found quitclaim deeds conveying parcels of

5  United States property to the plaintiff in that case contained restrictions on use that were

6  sufficient to state a claim against the plaintiff's planned use of the parcels.  766 F.2d at 450.  In

7  State of North Dakota, the Eighth Circuit Court of Appeals found the plaintiff's cause of action

8  accrued when the United States began accepting bids for oil and gas leases on riverbed land

9  underneath a navigable river claimed by the state.  789 F.2d at 1310-1311.  In Yuba Goldfields,

10  the Ninth Circuit Court of Appeals held that California's participation in the conveyance of land

11  to the United States, even though California had paid half the cost of the land, was sufficient to

12  commence the running of the statute of limitations.  752 F.2d at 394-395.  In contrast, the Ninth

13  Circuit Court of Appeals in Fadem v. United States, 52 F.3d 202 (9th Cir 2004), held that mere

14  knowledge of a boundary dispute between the United States and a landowner was not sufficient

15  to constitute accrual of a claim against the United States until the survey of the boundary in

16  question was approved.  The Fadem court observed that, until the survey was approved, there

17  was no information discoverable by the landowner that could have indicated that the United

18  States had a claim to the land in question.  Id. at 207.

19    It is this court's opinion that the facts of this case echos issues that were addressed in both

20  Fadem and Amoco Prod. Co.  As in Fadem, the BLM's final report of March 1979 gave notice of

21  which tracts of land were *eligible to be considered* for eventual incorporation into wilderness

22  area, but there was no indication of which land would be recommended for eventual

23  incorporation or which lands among those recommended would eventually be designated

24  wilderness areas under the Wilderness Act.  Because the process set up by FLPMA was expressly

25  in the nature of a survey and evaluation, there was every reason to understand that some land

26  would be recommended to be eventually designated as  wilderness area and some not.  This

27  expectation is borne out by the results of BLM's California Statewide Wilderness Study Report,

28

17

1  published in 1990 which, so far as the court can discern, gives a description of the results of

2  BLM's intensive study of the WSA's and sets forth BLM's recommendations that WSA's # 147,

3  containing the western segment of Petro Road,  and # 112, containing all of Last Chance Road

4  *not* be set aside as wilderness areas.

5      The facts of this case also echo the concerns raised in Amoco Prod. Co. in that the court

6  here is also confronted with an unsettled question as to what event should be held to commence

7  the running of the statute of limitations.  As previously discussed, the court has found that the

8  district court's decision in Southwest Four Wheel Drive Ass'n is not authoritative in settling the

9  question.  So far as the court can determine, in every other case cited where there is found to be a

10  United States claim that clouds the title of a plaintiff, that claim is evinced by a completed

11  survey, a deed, a conveyance, leasing activity, or some other communication that evinces a

12  present, non-contingent, claim of the United States that either immediately or foreseeably comes

13  into conflict with the plaintiff's claim.  The court finds the contingent possibility that a tract of

14  land may eventually be designated by legislative enactment as wilderness area under the

15  Wilderness Act does not state a claim of the United States sufficient to commence the running of

16  the statute of limitations.

17              ***2.  Current Temporary Impairment of Use Commences Statute of Limitations***

18      The remaining issue is whether the present restrictions placed on the WSA's at the time

19  of their designation were sufficient to cloud Plaintiff's titles to the rights of way even though the

20  impairment of use of the rights of way was limited in time by the time allotted for the completion

21  of the FLPMA process.

22      Generally, a title holder has a "constitutionally protected property interest in a

23  landowner's right to devote [his or her] land to any legitimate use."  Squaw Valley Dev. Co. v.

24  Goldberg, 375 F.3d 936, 949 (9th Cir. 2004).  Even a temporary or partial impairment to property

25  rights are sufficient to merit procedural due process protection."  Connecticut v. Doehr, 501 U.S.

26  1, 12 (1991).  Because the Quiet Title Act constitutes a waiver of sovereign immunity, its terms

27  are strictly construed.  State of Vevada v. United States, 731 F.2d 633, 634 (9th Cir. 1984).

28

While different levels of interference with property rights may be required to show infringement with respect to different constitutional or statutory protections, generally the Due Process Clause recognizes a broader range of interests.  See Pro-Eco v. Board of Comm'rs, 57 F.3d 505, 513 (7th Cir. 1995).  Given that the court must strictly construe the terms of the waiver of sovereign immunity, the court must conclude that a title holder's rights are impaired for purposes of accrual of a cause of action under the Quiet Title Act at the same time the same rights are impaired for purposes of constitutional procedural due process analysis.

Plaintiff argues that the restrictions imposed by BLM's designation of the survey land units as WSA's did not constitute a claim of the United States that was adverse to the Plaintiff's claim because Plaintiff was able to continue the use of the rights of way after their designation as WSA's in the same manner and to the same extent as it had done before the designation. Pursuant to the Quiet Title Act, a plaintiff's claim for relief accrues when the plaintiff knows or should have known of a claim.  28 U.S.C. § 2409a(g).  As Defendants correctly point out, actual adversity is not required to commence the running of the statute of limitations.  Yuba Goldfields, 752 F.2d at 397.  All that is required is that some right the plaintiff could exercise be impaired.

As previously discussed, BLM's duty under FLPMA to prevent degradation of existing values resulted in an impairment of Plaintiff's ability to enhance or up-grade any of its rights of way for a period of about 12 years.  That impairment, even though temporary, implicated Plaintiff's due process rights as of the time BLM's determined that the land in question was a WSA within the terms of FLPMA.  That impairment, being sufficient to trigger the protections of the Due Process Clause, was also sufficient to give rise to an action under the Quite Title Act.

The court finds Plaintiff's causes of action with respect to the rights of way that were incorporated into areas that were determined by BLM to be WSA's accrued at the time BLM made its final survey report and published the list of WSA's in the Federal Register in 1979.  As a consequence, claims under the Quiet Title Act are time barred with respect to those rights of way located within the areas that were finally designated as WSA's by BLM in 1979.

**II. Sufficiency of the Pleading**

Defendants contend Plaintiff's action must be dismissed because it fails to plead with particularity the date that their cause of action under the Quiet Title Act accrued.  Since the court has found that Plaintiff's claims under the Quiet Title Act are all time-barred with the exception of their claim to the eastern segment of Petro Road, there is no need to address Defendants' contention except as it may apply to Plaintiff's surviving claim.

Plaintiff, in its opposition to the motions to dismiss, contends that the allegations at paragraphs 4, 38, 39, 64, 72, 80, and 87 of the Complaint allege with particularity the actions of the United States that constituted notice to Plaintiff of United States' adverse claims to Plaintiff's titles to the rights of way at issue.  The court has examined the cited paragraphs and finds they refer to various actions by BLM, such as the posting of signs or the erecting of physical barriers, that Plaintiff contends constitute notice of an averse claim. The Complaint also states, in pertinent part, "Defendants have based their assertions and actions on the passage of the California Desert Protection Act of 1994, PL 103-433, October 31, 1994, 108 Stat. 4471." Complaint at ¶39.   Plaintiff contends that, in the alternative, this statement sets forth the earliest date from which its claim(s) under the Quiet Title Act could have accrued.

As the court has concluded, Plaintiff's action under the Quiet Title Act accrued with the enactment of the CDPA as to the eastern segment of Petro Road.  While Plaintiff may not have pled the elements of its action under the Quiet Title Act with the sort of particularity that might be desired; under the present circumstances, where the court has clearly defined which claims are time barred and which are not, there is no purpose to be served by a more precise pleading. Although the court would probably be within its discretion to dismiss the complaint and order a more particular pleading, such an order would not serve any identifiable need and would only serve to unnecessarily prolong the proceedings.  The court will therefore find that the complaint is pled with sufficient particularity as to Plaintiff's claim under the Quiet Title Act to the eastern segment of Petro Road.

THEREFORE, in consideration of the foregoing, it is hereby ORDERED that:

20

1.  Plaintiff's claims for relief set forth in the Complaint as to Padre Point Road, Lost Section Road - South, Last Chance Road, and the western segment of Petro Road, from its entrance into Greenwater Canyon to its western terminus at Greenwater Canyon Road (County Road 5005), are hereby DISMISSED as time-barred.

2.  Defendants' motion to dismiss Plaintiff's action as to the eastern segment of Petro Road, beginning at its intersection with State Route 127 and continuing until it turns south into Greenwater Canyon, is hereby DENIED.

3.  The court shall make no determination of the exact boundary between that portion of Petro Road that was included in WSA # 147, and that segment that was excluded, except that either party may petition the court to make such determination after notice and hearing.

IT IS SO ORDERED.

**Dated:   August 8, 2008**                         **/s/ Anthony W. Ishii**
                                      CHIEF UNITED STATES DISTRICT JUDGE