IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COUNTY OF INYO,<br><br>    Plaintiff,<br><br>    v.<br><br>DEPARTMENT OF THE INTERIOR, DIRK KEMPTHORNE, in his capacity as Secretary, NATIONAL PARK SERVICE, MARY A. BOMAR, in her capacity as Director, and JAMES T. REYNOLDS, in his capacity as Superintendent, Death Valley National Park,<br><br>    Defendants. | CV F 06-1502 AWI DLB<br><br>**MEMORANDUM OPINION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br><br><br>Doc. #'s 92 and 95 |

This is an action by plaintiff County of Inyo ("Plaintiff") to quiet title to rights of way that lie inside federal land in the vicinity of Death Valley National Park, near the California-Nevada border. The complaint filed on October 25, 2006, listed four roads or segments of roads as being the subject of Plaintiff's quiet title action. Following motions to dismiss based on applicable statutes of limitations, and following stipulated amendments and corrections, the only right of way remaining in contention in this action is a short segment of alleged road located in the northern end of Death Valley called "Last Chance Road."

**STIPULATED UNDISPUTED MATERIAL FACTS**

Essentially all material facts necessary to the court's decision have been stipulated by the parties. Document # 91, filed on August 20, 2010, sets forth 98 stipulated facts and appends maps and deposition testimony in support of the facts. For purposes of this decision, the court

will rely on a relatively smaller subset of the stipulated facts which the court summarizes as follows.

      On July 26, 1866, Congress passed "An Act Granting Right of Way to Ditch and Canal Owners Over The Public Lands and For Other Purposes," Ch. 262, 14 Stat. 251, 253 (commonly referred to as the Mining Act of 1866). Section 8 of the Act was codified in 1873 in the Revised Statutes as section 2477 upon publication of the Revised Statutes. The statue is commonly referred to as "R.S. 2477" and was later recodified in 1938 as 43 U.S.C. § 932. R.S. 2477 provides in its entirety: "The right-of-way for the construction of highways over public lands, not reserved for public uses, is hereby granted." R.S. 2477 was repealed in 1976.

      On November 26, 1934, an executive order was signed pursuant to the Taylor Grazing Act of 1934 which temporarily withdrew all the vacant unreserved and unappropriated public land in California in order to subject the lands to categorization and determination of most appropriate use, including conservation and subject to rights existing at that time. The Secretary of the Department of the Interior was authorized to classify the withdrawn lands and to open the lands or not in accordance with the classification determined. With regard to the lands underlying the Last Chance Road, the Secretary did not exercise authority to classify the lands until 1967 at which time the lands were classified and opened for multiple uses. The parties appear to agree that the upshot of the withdrawal of the lands in 1934 removed the land underlying Last Chance Road from the category of "lands not reserved for public uses" from 1934 until 1967. On October 21, 1976, Congress enacted the Federal Land Policy and Management ACT ("FLPMA"), which repealed R.S. 2477 and designated the lands underlying the claimed Last Chance Road as part of the California Desert Conservation Area.

      On October 31, 1994, the lands underlying the claimed Last Chance Road were placed under the jurisdiction of the National Park Service and designated as wilderness pursuant to the California Desert Protection Act, 16 U.S.C. § 410aaa et seq. The parties agree that certain roads existing at that time were excluded from the designation as wilderness area. It appears that it is also agreed that the portion of Last Chance Road that is at issue in the instant motions for summary judgment was not among the roads or rights of way that were specifically excluded

from wilderness designation in 1994.  In 1995 the National Park Service placed signs prohibiting motorized travel on roads or rights of way not excluded from wilderness area designation, including the portion of Last Chance Road at issue in this action.

Plaintiff's claim of entitlement under R.S. 2477 stems from actions taken by the Inyo County Board of Supervisors on March 1, 1948, when they adopted Resolutions 48-8 and 48-9 which established identified certain roads as county roads.  The resolutions did not name the roads or disclose their locations directly within the resolutions; rather, the Resolutions refer to attached maps of the County system of primary and secondary roads, amendments and revisions to the County road register, an official map of the primary road system of the County, and a set of official route descriptions of the roads in the County's primary road system." Doc. # 91 at ¶ 17. The County has not been able to locate either the referenced maps or the referenced route descriptions.  Although the matter is not crucial to the court's analysis, the court notes there remains some degree of controversy whether other documents produced by Plaintiff identify a segment corresponding to what Plaintiff contends is Last Chance Road, whether the documents so identifying Last Chance Road were intended as official registries of County roads, and whether the "Last Chance Road" identified on the documents was ever actually incorporated by an action of the Board of Supervisors into the County system of roads.

While the parties generally dispute whether Plaintiff has adequately demonstrated that Last Chance Road was, in fact, placed into Inyo County's Registry of Roads by virtue of the actions of the Board of Supervisors in 1948, the parties have agreed as to the existence of a number of maps that indicate a feature called Last Chance Road and *generally* indicate its whereabouts.  The maps most referred to by the parties are provided, for purposes of the present cross-motions, at Part Two of Exhibit 2 of exhibits appended to the Opposition of Defendant Intervenor, Center for Biological Diversity.  Chronologically, the first of the referenced maps is the "Lida" map, dated 1913, Doc. # 94-3 at 3; the "Magruder Mountain" map, dated 1957, Doc. # 94-3 at 5; the "Last Chance Range" map, dated 1985, Doc. 94-4 at 3; and the "Last Chance Mountain" map, dated 1987, Doc. # 94-4 at 5.  Of these, the Magruder Mountain map and the Last Chance Mountain map appear to depict best the feature the parties refer to as Last Chance

3

1  Road. All the maps depict a road called "Willow Spring Road[1]" running roughly east to west
2  across the Last Chance Mountain Range, which forms the northwest boundary of Death Valley.
3  At approximately the midpoint of its traverse across the Last Chance Mountain Range, Willow
4  Spring Road makes a 90-degree turn toward the northwest. At the apex of this turn, the
5  Magruder Mountain map and the Last Chance Mountain map show clearly a line denoting a road
6  proceeding for a short distance southeasterly from its origin on Willow Spring Road for about
7  one-half mile ending at what appears to be a deep drop-off into Last Chance Canyon. Whether
8  the parties agree that the Last Chance Road was properly adopted, described or demarcated, it
9  appears that the maps indicate at least the general location of the feature called Last Chance
10 Road.

11         As between the various maps, it appears that the feature called Last Chance Road has
12 varied somewhat as to path and as to point of termination. The 1913 Lida map appears to show
13 Last Chance Road ending at a point somewhat south east of the other maps and appears to show
14 the road possibly continuing as a foot path down into Last Chance Canyon. Although some maps
15 show the continuation of a road, trail or path from a point on the rim of the canyon south down
16 the canyon wall and into the bottom of Last Chance Canyon, the parties seem to agree that
17 vehicular passage beyond the rim overlooking Last Chance Canyon is and would have been
18 impossible based on current observations of the terrain. See Parties' Stipulated Undisputed
19 Facts, Doc. # 91 at ¶¶ 63 to 65. The Parties' Stipulated Undisputed Facts states that Plaintiff
20 "claims a right of way over the route the County asserts currently exists on the ground and which
21 the County believes is indicated in the 1987 Last Chance Mountain Map." Doc. # 91 at ¶62. The
22 court also notes that what is not at issue here is the road that approaches Last Chance Spring
23 from the south or the road that appears to go up the eastern reach of Last Chance Canyon and

---

[1] The court must once again admit to some small amount of uncertainty owing to the many maps in this case. It appears to the court that what the court takes to be Willow Springs Road goes through Cucomongo Canyon. The Wilderness Inventory Handbook by the U.S. Department of the Interior, in designating "Area 112" which the court supposes contains the remnant of Last Chance Road at issue here, notes the area as being bounded by a Cucomongo Road, which the court cannot find on other maps submitted. The court proceeds in the hope its uncertainty will not make any difference.

4

then turns east up Copper Canyon.  The court also notes that on the 1987 Last Chance Mountain Map, the segment of road at issue is marked with the designation "4WD."

In addition to the above mentioned topographical maps, Defendant Intervenors submitted a number of areal photographs that show the bend in Willow Springs Road where the segment of Last Chance Road is supposed to originate.  See Doc. # 94-5 at pp. 6-11.  These photographs, along with the various other maps and route descriptions are referenced in the Parties' Stipulated Undisputed Facts to underscore what appears to be an undisputed fact that the description of the route taken by Last Chance Road on the ground has varied over time.  Whether the route has remained constant and the depictions of it on maps has changed, or the route itself has changed over time is not established by the evidence at hand.  Plaintiff describes the course of the road claimed in this action as following from the point of departure on Willow Springs Road south along a wash for about a quarter mile then proceeding uphill generally to the rim of Last Chance Canyon.  Plaintiff admits that the claimed road now terminates at a point west and somewhat south of the point of its termination in the past.

Of some importance to the court's analysis, the Parties' Stipulated List of Undisputed Facts lists a number of facts under the heading "Alleged County Construction and Maintenance," Doc. # 91 at ¶¶ 70 - 91, from which the court may reasonably infer three important facts.  The first is the observation that very few people, perhaps only one person, have personal knowledge of the County's involvement with the subject segment of Last Chance Road by having actually provided on-the-ground grading or maintenance.  The parties agree that the County has no written official records to indicate that "the claimed Last Chance Road was mechanically constructed."  Id. at 67.  Nor does the County have written records of when or whether the Last Chance Road was "mechanically maintained."  Id. at 69.  The second fact that may be inferred is that the single individual available to Plaintiff who had or may have had personal on-the-ground experience with any maintenance work on Last Chance Road has recollections of activities that are at best spotty with regard to what activities were actually undertaken and when and where the activities may have been undertaken.  Plaintiff contends that there remains to this day physical indications of the existence of at least portions of a road corresponding to the claimed route.

5

1      Third, and perhaps most significant for the court's purposes, the County's sole employee
2 who claims to have participated in road grading on the Last Chance Road segment in question
3 could not recall that the path he followed during an on-site deposition in 2010 was the same as
4 the path that he recalled grading, nor was he able to identify features, such as berms or windrows
5 that were conclusively the result of road maintenance operations.  Another County Employee,
6 Mr. Pederson, was unable to point to any features in the area covered in the on-sight Deposition
7 as definitely signifying mechanical construction or maintenance, nor did the Roads Foreman for
8 Death Valley National Park find "signs of mechanical construction or maintenance at any
9 location along the claimed Last Chance Road." Doc. # 91 at ¶ 91.  The only use of the claimed
10 Last Chance Road actually known to anyone is the occasional use at some time in the past by
11 hunters.  Id. at ¶ 98.

## PROCEDURAL HISTORY

13      The complaint to quiet title was filed by Plaintiff on October 26, 2006. The court
14 subsequently granted the motion to intervene by California Wilderness Coalition, Center for
15 Biological Diversity, Friends of the Inyo , Sierra Club, and The Wilderness Society on June 14,
16 2007.  Motions to dismiss for lack of subject matter jurisdiction were filed by Department of the
17 Interior and Intervenors (collectively, Defendants) on May 9, 2008.  The May 9 Motions were
18 based primarily on issue of whether Plaintiff's claims to quiet title were time barred.  The court
19 issued an order on Defendants' motions to dismiss on August 11, 2008, and subsequently revised
20 and amended the order twice to correct errors in the judgment that were stipulated to by all
21 parties.  Plaintiff filed its motion for summary judgment on September 9, 2010; Federal
22 Defendant National Park Service filed its cross-motion for  summary judgment on October 18,
23 2010.  As previously noted, the sole remaining claim to quiet title pertains to the above-described
24 segment of Last Chance Road.  The court granted Defendants' request for leave to Take
25 Additional Depositions on December 13, 2010, and continued deadlines for further briefing on
26 the cross-motions for summary judgment accordingly.  Briefing on the instant cross-motions for
27 summary judgment was completed on October 6, 2011.

6

**LEGAL STANDARD**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Poller v. Columbia Broadcast System, 368 U.S. 464, 467 (1962); Jung v. FMC Corp., 755 F.2d 708, 710 (9th Cir. 1985); Loehr v. Ventura County Community College Dist., 743 F.2d 1310, 1313 (9th Cir. 1984).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Although the party moving for summary judgment always has the initial responsibility of informing the court, the nature of the responsibility varies "depending on whether the legal issues are ones on which the movant or the non-movant would bear the burden of proof at trial." Cecala v. Newman, 532 F.Supp.2d 1118, 1132-1133 (D. Ariz. 2007). When the moving party has the burden of proof at trial, that party must carry its initial burden at summary judgment by presenting evidence affirmatively showing, for all essential elements of its case, that no reasonable jury could find for the non-moving party. United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir.1991) (en banc); Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986); see also E.E.O.C. v. Union Independiente De La Autoridad De Acueductos Y Alcantarillados De Puerto Rico, 279 F.3d 49, 55 (1st Cir. 2002) (stating that if "party moving for summary judgment bears the burden of proof on an issue, he cannot prevail unless the evidence that he provides on that issue is conclusive.")

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender

evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Anderson, 477 U.S. 248-49; Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

     In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  First Nat'l Bank, 391 U.S. at 290; T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); International Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

     In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c); Poller, 368 U.S. at 468; SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982).  The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)(per curiam); Abramson v. University of Hawaii, 594 F.2d 202, 208 (9th Cir. 1979).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

**DISCUSSION**

There is no question that Plaintiff's claim of right-of-way is based on their contention that a grant of right of way was offered to Inyo County for the land underlying Last Chance Road by the federal government under the terms of R.S. 2477 and that the grant was accepted. Plaintiff asserts two principle arguments to support the claim of acceptance of the right of way. First, Plaintiff contends County of Inyo demonstrated acceptance in 1948 when the Inyo County Board of Supervisors incorporated by reference a map and set of road descriptions – including the claimed Last Chance Road – in the official Inyo County Maintained Road System. There is no question that Plaintiff, who seeks to enforce a right-of-way against the federal government, bears the burden of proving that the grant of right of way under R.S. 2477 was accepted. See Southern Utah Wilderness Alliance v. Bureau of Land Management, 147 F.Supp.2d 1130, 1136 (D. Utah 2001). It is well established that "land grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it." United States v. Union Pacific R.R. Co., 353 U.S. 112, 116 (1957). As mentioned earlier, R.S. 2477, originally passed as a part of the Mining Act of 1866 provides, in its entirety, that "the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." The grant of right-of-way that is provided by R.S. 2477 is self-executing such that the right-of way comes "into existence automatically when a public highway [is] established across public lands in accordance with the law of the state." Standage Ventures, Inc. v. State of Arizona, 499 F.2d 248, 250 (9th Cir. 1974). "R.S. 2477 as 'as a present grant which takes effect as soon as it is accepted by the State,' and acceptance requires only 'some positive act on the part of the state, clearly manifesting an intention to accept.' [Citation.]" Lyon v. Gila River Indian Community, 626 F.3d 1059, 1077 (9th Cir. 2010).

**I. Choice of Law**

The parties dispute whether state law or federal law determines how a right of way under R.S. 2477 is acquired. This issue has been a matter of some controversy, particularly where, as here, efforts of the federal government to manage its land under restrictive environmental

programs is in conflict with local claims of right.  See Western Aggregates, Inc. v. County of Yuba, 101 Cal.App.4th 278, 295 (3rd Dist. 2002) (citing various review articles on the subject).  In Southern Utah Wildnerness Alliance v. BLM, 425 F.3d 735, (10th Cir. 2005)[2] (hereinafter "SUWA"), the question directly before the court was whether the Bureau or the district court had primary jurisdiction over actions to quiet title under R.S. 2477.  In deciding that the district courts have primary jurisdiction, the SUWA court remanded the case to the district court for determination of the claim with extensive instructions.  As Defendants point out, case law from the Tenth Circuit is not binding in this circuit, and to the extent the SUWA court addressed substantive legal claims pertaining to R.S. 2477 rights of way, such discussion is technically dictum.  However, this court has noted with approval the approach taken in SUWA, see, e.g., Friends of Panamint Valley v. Kempthorne, 499 F.Supp.2d 1165 (E.D. Cal. 2007), and this court finds that both the structure and content of the "instructional" information contained in the SUWA decision are useful in this analysis and the use of that case as authority by this court prejudices neither party.

   In SUWA, as here, the parties' arguments reflected their concern that the choice of federal or state law would be determinative of the outcome of the case; a concern that both the SUWA court and this court find is exaggerated.  See id. at 758 ("we are more doubtful than the parties that the choice between federal and state law is outcome determinative").  As noted in SUWA, the principal difference between the application of federal or state law has to do with the issue of whether a state claimant of an R.S. 2477 right of way must show actual "construction" of the highway.  Id.  Based on an extensive review of federal and state law, the SUWA court concluded that federal courts "borrow" from state law to aide in the interpretation of R.S. 2477.  Id. at 768. In Friends of Panimint Valley, this court cited SUWA for the proposition that:

> *federal law governs the interpretation of R.S. 2477*, but [ ] in determining what is required for acceptance of a right of way under the statute, federal law "borrows" from long-established principles of state law, to the extent that state law provides convenient and appropriate principles for effectuating congressional intent.

---

   [2]   There are apparently more than two cases captioned Southern Utah Wilderness Alliance v. BLM. Unless otherwise specified SUWA as used here refers to the 2005 opinion by the Tenth Circuit Court of Appeals.

Panamint Valley, 499 F.Supp.2d at 1176 (quoting SUWA, 425 F.3d at 768) (italics in Panamint Valley). "It follows that to the extent state law is 'borrowed' in the course of interpreting R.S. 2477, it must be in service of 'federal policy or functions,' and cannot derogate from the evident purposes of the federal statute. State law is 'borrowed' not for its own sake, and not on account of any inherent state authority over the subject matter, but solely to the extent it provides 'an appropriate and convenient measure of the content' of the federal law." SUWA, 425 F.3d at 763. For the reasons that follow, the court finds the conclusion it reaches on the issue of what role state law should play in this decision is not a determinative factor in the outcome of these motions. The court assumes without deciding that the approach used in SUWA is appropriate to the analysis at hand as will be more completely discussed below.

A state's acquisition of a grant of right of way under R.S. 2477 may be found in facts that lie along a continuum whose polar ends can be described best by paraphrase from the movie "Field of Dreams:" If they built it and the travelers came, the right-of-way is there. At the other end of the spectrum it is equally indisputable that if nobody built it, and nobody came, it was never there. Unfortunately for Plaintiff, who bears the burden of proof, the state of the evidence places them close enough to the second polar extreme that it matters little to their cause whether the court looks to state law or to federal law.

**II. Substantive Legal Issues**

In terms of the substantive legal issues that determine whether a right of way is acquired pursuant to R.S. 2477, the SUWA court addressed three issues that are of primary interest in this analysis. See id. At 768 (setting forth the standards to be considered by the district court on remand). Observing that at common law, the establishment of a grant of right of way required first the intent of the owner to dedicate the land to a right of way, and second a manifestation of acceptance of that dedication by the public, the first issue addressed by the SUWA court was what constitutes acceptance of the grant by the public. The second issue is whether the route that is the subject of the grant of right of way is a "highway" as that term is defined by state law. The third issue considered by the SUWA court that is of importance to the parties' contentions is the issue of whether a route must by "constructed" to fall within the meaning of R.S. 2477. The

11

SUWA court concluded that whether mechanical means of construction were used in the establishment or maintenance of the route is not determinative of its status as a "highway" under R.S. 2477. Id. at 782.

This court will follow the analytical lead set by the Tenth Circuit by addressing first whether there was acceptance of the grant of right of way and second whether the right of way sought by Plaintiff is for a "highway" within the meaning of applicable state law.

### A. Acceptance of Grant of Right of Way Under R.S. 2477

In Western Aggregates, the California appellate court recognized a multiplicity of means by which acceptance of a grant of right of way under R.S. 2477 might be accomplished including by public use, by "acceptance by a public entity," or by public use over time in a manner something akin to adverse possession. See Western Aggregates, 101 Cal.App.4th at 296-297 (reviewing the means of acceptance by various jurisdictions and rejecting or disapproving none). The Western Aggregates court appears to have found the common law rule of dedication of a thoroughfare to public use in Smith v. San Luis Obispo, 45 Cal. 463 (1892), which was quoted in Western Aggregates as follows:

> In California, "Dedication of land to a public use is simply setting it apart or devoting to that use. To constitute a dedication at common law no particular formality of either word or act is required [ Smith v. San Luis Obispo, 45 Cal. 463 (1892.)] "[U]se of a street by the public for a reasonable length of time, where the intention of the owner to dedicate is clearly shown, is sufficient, without any specific action by the municipal authorities, either by resolution or by repairs or improvements. (Id. at p. 470).

Western Aggregates, 101 Cal.App.4th at 297.

#### 1. Official Action

The court begins by noting that whether the right-of-way they claim was duly included in Inyo County's Official Register of Maintained Roads by virtue of the actions of the Board of Supervisors in 1945 is problematical. First, the label "Last Chance" is fairly ubiquitous in the region being the name given to a mountain range, spring, canyon and to the southern segment of a road of the same name going northward up the canyon of the same name to the spring of the same name. Under such conditions, the reference by the County Board of Supervisors to a now-lost map and/or to a conflicting route description bearing the name "Last Chance Road" is

12

insufficient to support the proposition that "Last Chance Road" became a highway for purposes of R.S. 2477 based on an official enactment of the local government.

Even if the map and/or list of roads that were incorporated by reference into the County's Official Register in 1948 could actually be produced, the depiction of Last Chance Road on the map or its description on the list is not conclusive of its existence. Plaintiff has admitted that some of the roads depicted on the map or maps in 1948 and/or described on the list did not exist at the time. Under federal law, "'it was not intended [by Congress] to grant a right of way over public lands in advance of an apparent necessity therefore, or on the mere suggestion that at some future time such roads may be needed.'" SUWA, 425 F.3d at 766; see also Western Aggregates, 101 Cal.App.4th at 298 (markings on official maps can be evidence that a road existed but do not *create* the road).

Defendants also attack Plaintiff's claim that Last Chance Road was incorporated into the County System of Roads by pointing out that an executive order promulgated by President Roosevelt in 1934 withdrew the lands underlying the claimed Last Chance Road from public use under the Taylor Grazing Act of 1934. Defendants contend the land remained withdrawn from public use until the land was opened for public use again on December 14, 1967. While Plaintiff suggests that the withholding of land from public use under the Taylor Grazing Act may not have applied to grants of rights of way under R.S. 2477, the Ninth Circuit has held the contrary in Humbolt County v. United States, 684 F.2d 1276 (9th Cir. 1982). The Humbolt County court recognized that congress in 1936 amended the Taylor Grazing Act to permit the Secretary to open up lands closed to public use under the Act subject to the fulfilment of certain requirements. However, absent evidence of an action by the Secretary pursuant to the requirements of the amended Act, the Humbolt County court held that the withdrawal of federal lands under the Taylor Grazing Act removed them from the public and therefore made unavailable grants of right of way under R.S. 2477. Id. at 1280-1281. Here, Plaintiff offers no evidence that the lands withdrawn from public use by the Taylor Grazing Act were made available at any time prior to December 14, 1967. This court therefore finds any enactments by the Inyo County board of Supervisors regarding acceptance of a grant of right of way from 1948 through 1967 would have

been ineffective for that purpose.

Plaintiff contends that, even if the County Board of Supervisor's actions in 1948 were ineffective for purposes of accepting the grant of 2477 right of way, the acceptance was accomplished on May 4, 1976, when the Inyo County Board of Supervisors passed Resolution No. 56-51. Plaintiffs allege that this resolution added roads to and deleted roads from a map of county roads that constituted the roads officially recognized by the County. Plaintiff alleges that the map is not in the County's possession. Plaintiff alleges there was a tabulation of road names and their lengths appended to the official map and the tabulation contains a notation of a "Last Chance Road" which is 0.59 miles in length. Plaintiff contends that the passage of Resolution No. 56-51 and the tabulation containing a notation of the name "Last Chance Road" and its length is sufficient to denote acceptance of the R.S. 2477 grant of right of way.

The court notes that Defendants contend that County of Inyo formally abandoned its claim to Last Chance Road in 1956. Defendants' contention arises out of the fact that on May 3, 1956, the Inyo County Board of Supervisors adopted a revised official register of maintained county roads that excluded 26 miles of the county road system. Defendants contend that the excluded milage is accounted for by the exclusion of Last Chance Road and Arrow Road. See Doc. # 91 at ¶¶ 39-42. While Plaintiff admits that "nearly all of the Last Chance Road" was abandoned by the County's action they contend that the segment currently at issue in these cross-motions was not abandoned. Defendants' contention is not without its own ambiguity. Apparently the County Board's action referenced two exhibits, a map and a tabulation of roads and mileages and neither can be located. While the issue of potential abandonment of the disputed segment of Last Chance Road adds somewhat to the overall ambiguity of official county actions regarding the road, the court finds the potential of abandonment is not itself determinative.

What convinces the court that official acts by the Inyo County Board of Supervisors were never sufficient to show unambiguous acceptance of a grant of right of way under R.S. 2477 with respect to Last Chance Road is the county's admission that some of the roads incorporated into the Official Register of County Roads in 1948 did not actually exist at the time. See Doc. # 91 at

14

¶¶ 27-28. From that, and the uncertainties that surround the fact that original maps and road registries from the time period are not available, the court must conclude that county action in 1948 was not sufficiently specific to establish a right of way. Since that time, it appears to this court that subsequent references to Last Chance Road in subsequent county actions, whether those be acknowledgment or abandonment of the road, merely continue the ambiguity that was first established in 1948. The court therefore finds that official actions by the Inyo County Board of Supervisors did not result in the unequivocal acceptance of the federal government's offer of Right of Way under R.S. 2477 with regard to Last Chance Road.

### 2. Public Use

Lacking an unambiguous acceptance of the offer by any official action of county government, the court finds Plaintiff's claim of right-of-way must be supported, if at all, by evidence that something that could qualify as a highway under California law physically existed in the vicinity of the claimed right-of-way sometime prior to 1976. In order to carry this burden, Plaintiff will be required to show facts from which it may be inferred that a "highway" was established for the purposes of R.S.22477 by virtue of its use by the public.

In SUWA, the Tenth Circuit examined two proposed categories of evidence to determine if the jurisdiction had accepted the grant of right-of-way under R.S. 2477 by establishing "public use." The factors examined were the extent, duration and nature of the public use and whether or not there had been "mechanical construction." See SUWA, 425 F.3d at 769-782. Of the two factors, the SUWA court determined that the "public use" prong of the inquiry was the more determinative. See id. at 781-782 (concluding that a conclusion of acceptance of an R.S. 2477 grant does not require a showing of "construction"). While there is no question that evidence of mechanical construction or maintenance of a road is evidence of its existence, it appears to the court well established that the decision in SUWA accords with California state law in that evidence if mechanical construction is not required. See Smith v. San Luis Obispo, 45 Cal. 463 (1982) (acceptance of road dedicated to public can be evinced by use and maintenance is not required); Ball v. Stephens, 68 Cal.App.2d 843, 846-847 (2nd Dist 1945) (same); Western Aggregates; 101 Cal.App.4th at 296 (same).

1    While what constitutes "public use" of a route sufficient to qualify as a "highway" varies
2    somewhat from state to state, SUWA, 425 F.3d at 771, there is little controversy over what is not
3    sufficient to show public use. A road used sporadically merely by "sightseers, hunters and
4    trappers" can not be something that is "either necessary or convenient for the accommodation of
5    the public" and therefore a highway. Hamerly v. Denton, 359 P.2d 121, 125 (S.C. Alaska 1961).
6    "Where there is a dead end road or trail, running into wild, unenclosed and uncultivated country,
7    the desultory use thereof [. . .] does not create a public highway. Id; see also SUWA, 425 F.3d at
8    775-776 (citing a number of cases from the Tenth Circuit showing similar outcomes where use of
9    the road is casual, sporadic, or where the road does not connect points of some significance);
10   Southern Utah Wilderness Alliance v. BLM, 147 F.Supp.2d 1130, 1143 (D. Utah 2001)
11   (although "highway" need not connect two cities, routes that do not lead to an identifiable
12   location are unlikely to qualify).

13   The only "use" of Last Chance Road that can be verified on the basis of currently-
14   available information is its use by deer hunters. Even within that category, there is no indication
15   the route was used for "travel" in the normal sense. What may be reasonably inferred from the
16   deposition testimony by Mr. Huarte is that, to the extent last chance road was used at all by
17   hunters, it was used only as a place to pull off of Willow Creek Road, travel a few hundred yards
18   up the hill and park the 4-wheel drive vehicle. Further, the evidence adduced leads to the
19   conclusion that the use by public was, at most, sporadic. Deposition Testimony by Mr. Huarte
20   indicates that he sometimes saw hunters in the area in the mid-to late 1970's but he is not aware
21   of more recent use on anything like a regular bases. Plaintiff refers to historical accounts of
22   exploration and mining activities in the area and posits that Last Chance Road must have been a
23   thoroughfare of foot and pack animal travel between Last Chance Springs and the Willow Creek
24   Area. However, there are no geographical references to actual routes in the historical accounts
25   and Plaintiff's assertion that the route now claimed to be Last Chance road would likely have
26   been used in the past, have no evidentiary foundation. While the court recognizes that desert
27   areas such as Death Valley erode fairly rapidly and therefore change topography over time, there
28   is no reason to believe that the route identified as Last Chance Road, which now ends at a cliff,

was at one time a route of choice when a more plausible route for that purpose is currently located on maps lying to the southeast of the segment identified as Last Chance Road.  In sum, Plaintiffs been unable to adduce evidence tending to indicate that public use of the segment they now call "Last Chance Road" was, at any particular point in history, sufficient to establish the route as a highway for purposes of R.S. 2477.  While the court does not doubt that during times past the mining activities of the region would have caused significant travel over unimproved tracks, there is no evidence to show that what is called "Last Chance Road" on any of the maps submitted by either of the parties is one such commonly-used unimproved track of yesteryear.  The undisputed facts lead the court to the conclusion that "Last Chance Road" as identified by Plaintiff for purposes of the cross-motions for summary judgment has undergone only sporadic and very casual and desultory use.  As such it cannot be held that the offer of right of way for Last Chance Road under R.S. 2477 was established by public use.

### B. Last Chance Road is Not a "Highway"

The determination of whether a claimed right of way qualifies as a "highway" for purposes of R.S. 2477 is closely intertwined with the question of public use.  The difference is more one of emphasis with the question of whether the route is a "highway" being more a function of the route's purpose and structure, rather than of actual use.  Although the question of what qualifies as a "highway" was not prominent in the discussion in SUWA, the court there noted that "[h]ighways are the means of communication and of commerce."  SUWA, 425 F.3d at 782.  The SUWA court remanded the matter to the district court with instructions to "consider evidence regarding identifiable destinations as part of its overall determination of whether a contested route satisfies the requirements under state law for recognition as a valid R.S. 2447 claim."  Id. at 783-784.  As previously noted, the road claimed by Plaintiff as "Last Chance Road" goes nowhere identifiable or at least nowhere that Plaintiff has established is a recognized place, trail head, overlook or something similar   While it is true, as Plaintiff contends, that a route need not follow exactly the same track over time to qualify as a highway under R.S. 2477, there is simply no evidence, other than conjecture, that the road ever did actually connect to a destination that would prompt is use by travelers.

As noted, under California law there is no requirement that a "highway" be mechanically constructed, however the absence of clear and unambiguous evidence that there was any mechanical construction is at least inferential support for the conclusion that Last Chance Road was or is a route of little or no consequence for purposes of communication or commerce. The fact that no person at the on-site deposition in 2010 could identify any physical feature in that location that denoted a definite road built or traveled by people is evidence of the casual and sporadic nature of its use as well as of its lack of importance. Further, the physical nature of the road itself is, again, at least inferential evidence of its casual nature and lack of importance. Last Chance Road has been consistently identified as consisting of a dry sandy wash for at least the first half of its length. After going up the wash for some distance the road appears to have left the wash to go up small hill to the southeast of the wash and from there to have terminated at different points over the years. What the court infers from this is the fact that Last Chance Road was never a route of such compelling importance to public travel as to warrant any effort at durable improvement or regular maintenance over time. Upon the undisputed evidence available to the court, it is the court's conclusion that the route or routes labeled "Last Chance Road" never received public use or was of such importance to travel, communication or commerce as to warrant the designation of "highway" under R.S. 2477.

It must be kept in mind that, while California common law is rather liberal in the *scope* of official actions or conditions of public use that are sufficient to signify the acceptance of a grant of right-of-way under R.S. 2477, federal law requires that the official acts or conditions of use must *unequivocally* signify acceptance of the grant. Ambiguities, as previously noted, must be settled in favor of the federal government. The court finds that Plaintiff's official actions with regard to Last Chance Road are, at best, ambiguous. The factual context of public use indicates unequivocally that the segment of Last Chance Road at issue in these cross-motions for summary judgment never existed as a highway within the meaning of either California common law or within the meaning of federal law interpreting R.S. 2477. Because Plaintiff cannot make the required showing that the grant of right of way under R.S. 2477 was accepted by the State of California or the County of Inyo prior to 1976, Plaintiff's motion for summary judgment must

fail.  Correspondingly, Defendants are entitled to summary judgment in their favor with regard to all remaining claims for declaratory or injunctive relief in Plaintiff's complaint.

THEREFORE, it is hereby ORDERED that Plaintiff's motion for summary judgment is DENIED.  Defendants' cross-motions for summary judgment are correspondingly GRANTED.  The Clerk of the Court shall enter judgment in favor of Defendants and Defendant-Intervenors and shall CLOSE the CASE.

IT IS SO ORDERED.

Dated:   June 5, 2012

CHIEF UNITED STATES DISTRICT JUDGE